IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 2, 2024

# IN RE NICKOLAS K. ET AL.

**Appeal from the Juvenile Court for Smith County**
**No. 2022-JV-187    Branden Bellar, Judge**

_____

## No. M2023-00951-COA-R3-PT

_____

The trial court terminated the parental rights of Mother and Father based on the finding of multiple grounds and that termination was in the children's best interests. The trial court's finding of a failure to manifest an ability and willingness to assume custody of the children is vacated for lack of sufficient findings of fact. We affirm the remainder of the trial court's order, including both the finding of four grounds of termination against each parent and the finding that termination is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part; Affirmed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and JEFFREY USMAN, JJ., joined.

Matthew B. Ramsey, Lebanon, Tennessee, for the appellant, Shelia K.

Randall Kirby, Sparta, Tennessee, for the appellant, Ernest K.

Jonathan Skrmetti, Attorney General and Reporter; Carrie Perras, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

On September 29, 2021, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") received a referral that the minor children of

Respondent/Appellant Sheila K.[1] ("Mother") and Respondent/Appellant Ernest K. ("Father" and together with Mother, "the parents") were exposed to drug use and domestic violence. DCS records from another county indicated that there had been allegations of educational neglect, drug exposure, and homelessness in April 2021. When the investigating DCS case worker ("CM Miller") finally made contact with the family on October 6, 2021, Father was uncooperative and refused to allow her to speak privately with the children: a son, Nickolas, born in January 2008, and a daughter, who goes by her middle name, "Gracie," born in December 2008. The parents explained that the children were homeschooled, but they were unable to provide any details regarding any program or curriculum in place or produce any books or worksheets. The family's landlord produced pictures of Mother after being abused by Father and of a hole in the wall that Gracie confirmed was the result of Father pushing Mother. When CM Miller was able to speak with Mother individually, she asked if Mother would want to leave Father and keep custody of the children. Mother stated that she was not afraid of Father and did not want to be away from him. Father refused to submit to a drug screen and forbade Mother from doing so. The landlord told CM Miller that she had begun the eviction process based on drug use and domestic violence concerns.

DCS filed a petition in the Smith County Juvenile Court ("the trial court") to declare the children dependent and neglected on October 8, 2021. The trial court entered a protective order placing the children in DCS custody the same day. The order found that there was probable cause to believe the children were dependent and neglected, that there was no less drastic alternative to removal, and that reasonable efforts were made to prevent the children's removal from the home.

On October 12, 2021, the trial court entered a preliminary hearing order indicating that although the parents had both been served, neither had appeared for the hearing. Thus, the trial court made a default finding of probable cause for the removal of the children. CM Miller also filed an affidavit of reasonable efforts. Beyond the allegations in the initial petition, CM Miller stated that the "specific risks necessitating removal" of the children included that:

> The children are not receiving any education. Nickolas should be attending the TN School for the Blind and has not since Spring 2021. [Gracie] has not attended school since Spring 2020. There are concerns of drug exposure by [F]ather. The children have witnessed domestic violence, specifically [F]ather beating [Mother]. The family has no transportation, no income, and are being evicted from their temporary housing.

---

[1] In cases involving the termination of parental rights, it is this Court's policy to remove the full names of children and other parties, to protect their identities.

CM Miller's suggestions for necessary requirements for the parents to meet before regaining custody included drug testing and assessments, psychological assessments, stable income and housing, and the cessation of domestic violence episodes.

A permanency plan was created October 27, 2021 and ratified by the trial court on November 8, 2021. The goal of the plan was to return the children to the parents' custody. The parents' responsibilities under the plan included obtaining safe and stable housing and legal income; resolving any pending criminal charges and refraining from further criminal activity; submitting to a psychological evaluation with clinical parenting and alcohol and drug components and following all recommendations; completing domestic violence counseling; submitting to an alcohol and drug assessment and completing all recommendations; submitting to random drug testing and providing negative results; and having meaningful and safe supervised visits with the children no less than twice a month for two hours. The trial court later approved and incorporated the same permanency plan into its January 25, 2022 order. The order indicated that the parents agreed with the plan, and that the plan's requirements were "reasonable, related to remedying the conditions that necessitate[d] foster care, and in the best interest of the children."

The trial court entered a default adjudication of dependency and neglect on April 26, 2022, because the parents had once again failed to appear.[2] A new permanency plan, with the goal of either returning the children to the custody of the parents or adoption, was ratified by the trial court on May 24, 2022. The plan indicated that the parents were not in agreement with the plan based on the dual goal of adoption. The parents had essentially the same responsibilities as in the earlier plan. However, visitation was suspended on February 22, 2022, until the parents submitted to a hair follicle drug screen and tested negative for any illicit and non-prescribed drugs.

DCS filed a petition to terminate parental rights on August 29, 2022. The petition alleged as grounds for termination against the parents: failure to establish a suitable home, substantial noncompliance with permanency plan, persistence of conditions, failure to manifest an ability and willingness to assume custody, as well as failure to visit and support against Mother and abandonment by incarcerated parent by failure to visit and support and wanton disregard against Father. DCS also alleged that termination of the parents' rights was in the children's best interests.

The children's case manager ("CM Burt") filed an affidavit of reasonable efforts on September 26, 2022. The affidavit described the services provided by CM Burt to assist the family. These services included attending hearings, developing permanency plans, attempting to arrange visitation, entering purchase requests for the parents to receive psychological assessments and drug screens, attempting to conduct home visits, and

---

[2] Counsel for each of the parents appeared at the hearing.

generally checking in with the parents.

On September 27, 2022, the trial court entered an annual permanency hearing order, indicating that the parents were in substantial noncompliance with the permanency plan ratified in May 2022. The parents still needed to "comply with the recommendations from [their] psychological assessment[s], comply with urine and hair follicle drug screens, obtain and maintain stable housing, submit to an A&D assessment, and provide proof of a legal source of income." Father also needed to resolve all criminal charges, probation, and fines. The order indicated that the children were placed together and doing well in their current placement. Both children were doing well in their respective schools[3] and receiving counseling. Termination of the parents' rights was deemed an appropriate goal.

A permanency plan was ratified by the trial court on November 14, 2022, indicating that the parents had both completed their psychological assessments, and that the children were placed together in a pre-adoptive and therapeutic home. The plan also indicated that visitation remained suspended, with the parents required to test negative for any illicit or non-prescribed drugs prior to readdressing the issue. The rest of the responsibilities from the initial plan remained in place.

The trial court heard the termination matter on April 23, 2023; CM Burt was the only witness, and the trial court specifically found her to be credible. CM Burt testified that she explained the criteria and procedure of the termination of parental rights to the parents, so that they would be aware of potential reasons their rights could be terminated. CM Burt stated that she explained the process of setting up visitation with the parents, which only required providing a phone number and address for CM Burt to use in arranging the visit, and offered to provide transportation if that was a hinderance to visiting with the children. She explained that it was difficult to get in contact with the parents, in part due to the parents' housing instability and changes to their contact information. One visit early in the custodial period was rescheduled because CM Burt's supervisor did not want her to supervise a visit alone, based on Father's earlier aggression towards her during their phone calls. The rescheduled visit was "set in stone," only for the parents to not show up as a result of vehicle trouble that CM Burt was not made aware of until later. CM Burt testified that the parents would not reach out to her or respond when she reached out to them. She opined that the parents' failure to communicate with her showed a lack of concern for the children.

CM Burt testified that the parents had not physically visited with the children once during the entire custodial period.[4] She admitted that the trial court suspended visitation in

---

[3] Nickolas had returned to the Tennessee School for the Blind and was living on campus during the week.

[4] She explained that the parents had phone calls with the children until March or April of 2022, as

February 2022, but stated that the only requirement to reinstating visitation was for the parents to complete a hair follicle drug screen. Mother completed a screen in September 2022, but tested positive for buprenorphine[5] without providing a prescription.[6] Father completed a screen in February 2023, testing positive for buprenorphine and oxycodone. Father provided a prescription for oxycodone for one month, despite CM Burt requesting monthly proof. The prescription was not current at the time Father tested positive, and he had not provided a prescription for buprenorphine.[7]

CM Burt also testified that the parents had not provided any financial support for the children. As for support in kind, Mother provided the children with Easter baskets once during the custodial period.[8] CM Burt indicated that she was unaware of Mother's employment history because it was her belief that Father was the sole provider for the family. Father had not provided any verification of income or employment, although CM Burt knew that he worked for his father on and off for many years.

CM Burt explained that Father was incarcerated January 20–24, 2022, for a failure to appear on a possession of drug paraphernalia charge. Father entered a guilty plea on January 27, 2022 and was placed on probation. Father was incarcerated April 15–21, 2022, after failing a drug test. Father pleaded guilty to the violation of his probation. After failing another drug test, Father pleaded guilty to a second violation of probation and was incarcerated from May 19 through June 9, 2022. CM Burt testified that Father did not visit with or provide any support for the children during the aggregation of 120 days of non-incarcerated time prior to the filing of the termination petition. She also opined that Father's violation of probation while the children were in state custody, as well as his failure to request visitation, pay support, and submit to drug screens, evidenced a wanton disregard for their welfare.

---

the foster family permitted the calls even after the suspension of visitation because they were not aware that the suspension applied to calls as well.

[5] Buprenorphine, for which Suboxone and Subutex are brand names, "is prescribed 'to help people reduce or quit their use of heroin or other opiates, such as pain relievers like morphine.'" *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *3 n.4 (Tenn. Ct. App. Oct. 29, 2018) (quoting *Buprenorphine*, Substance Abuse and Mental Health Services Administration, www.samhsa.gov/medication-assisted-treatment/treatment/buprenorphine). "Buprenorphine is a Schedule III controlled substance." *In re Elijah R.*, No. E2020-01520-COA-R3-PT, 2021 WL 2530644, at *1 (Tenn. Ct. App. June 21, 2021) (citing *State v. Boykin*, No. E2019-02070-CCA-R3-CD, 2021 WL 796838, at *1 (Tenn. Crim. App. Mar. 2, 2021); *State v. Milligan*, No. W2019-00377-CCA-R3-CD, 2019 WL 6139569, at *1 n.2 (Tenn. Crim. App. Nov. 19, 2019)).

[6] CM Burt stated that Mother provided proof of a prescription for oxycodone at some point, but had not tested positive for it on the drug screen. At trial, Mother provided a prescription pill bottle for buprenorphine dated April 7, 2023.

[7] CM Burt stated that she had proof of Father's oxycodone prescription in May 2022. At trial, Father provided a prescription pill bottle for buprenorphine dated April 17, 2023.

[8] CM Burt's testimony was that the baskets were for Easter 2022 but had been delivered sometime in 2023.

CM Burt read her affidavit of reasonable efforts into the record and stated that the parents had not made any reasonable efforts toward providing the children with a suitable home.[9] CM Burt testified that at one point during the custodial period the parents were homeless and living in a tent. During that time, the parents failed to maintain contact with DCS and missed court dates. The parents then moved into a home and provided CM Burt with a copy of their residential lease. However, in February 2023, Father did not let her into the home, citing issues with mold and broken windows. CM Burt admitted that she had not asked to see the home more recently. It was later revealed that the parents are currently living with Father's father, where the children had previously lived. However, CM Burt was concerned regarding the stability of this housing as Father and his father go through cycles of getting along and then getting into arguments, where the family has to leave the home. CM Burt's testimony was that the efforts of DCS in establishing a suitable home exceeded the efforts of the parents.

CM Burt outlined the general requirements set out by the permanency plans. She testified that although neither parent participated in the development of the initial plan, the parents had both participated in the development of the most recent plan. As to Mother, CM Burt testified that she submitted to a few urine drug screens and one hair follicle screen, but refused multiple other screenings. She has not provided proof of safe and stable housing or legal income, and has not visited with the children. As to Father, CM Burt testified that he has not regularly submitted to drug screens, submitted proof of housing or income, or refrained from engaging in criminal activity. Neither of the parents completed domestic violence counseling but the parents had both completed the required psychological assessment. CM Burt admitted that Father has not received any new criminal charges since June 2022 and that Mother has not reported any additional domestic violence incidents. She also admitted that the recommendation for family counseling resulting from the parents' assessments could not be completed based on the no-visitation order put in place in February 2022. It was CM Burt's opinion that the parents were no closer to reunification than they were at the start of the case.

Regarding the circumstances that led to the removal of the children, CM Burt stated that the concerns of drug abuse and domestic violence had not been alleviated at this point, with only the educational neglect remedied, and that because DCS ensured the children went to school. She felt that the failure to have safe and stable housing and proof of legal income to support the family also posed a potential risk of neglect and harm to the children. And as the case has been proceeding for more than a year, CM Burt did not believe the parents would remedy these conditions soon. She opined that returning the children to the

---

[9] She later testified that DCS was focusing on the efforts expended within the first four months following removal, because DCS's "completion goal is six months from the . . . creation of the [permanency] plan. So [DCS] would like to see significant progress in the first six months[.]"

parents' custody would pose a risk of substantial harm to the children's well-being, as their needs would not be met in the way they were being met in state custody.

CM Burt provided her opinion as to each of the best interest factors before providing her ultimate opinion that termination is in the best interests of the children. The children both attend counseling. CM Burt testified that, at the time of removal, the children were upset at being separated from their parents. However, the children have enjoyed the stability provided by their foster home and have become more open to adoption, especially in the last six months. CM Burt also noted that the children have acknowledged that the parents were not doing what was needed to regain custody. The children were moved from a pre-adoptive foster home a few weeks prior to the termination hearing. It was unclear at that time whether the new foster home was pre-adoptive, but CM Burt seemed optimistic. The children have already formed bonds with the new foster family but are required to remain in the home for six months prior to adoption. CM Burt admitted that DCS would be able to continue looking for pre-adoptive placements even if the parents' rights were not terminated, but that if their rights were terminated and no adoptive home was found, the children could be left without a legal mother and father. She stated that the children had some phone contact with their older brother at the beginning of the custodial period, but that DCS had not considered the brother as a potential placement for the children.[10] CM Burt testified that the children love the parents and the parents love the children.

At the end of the proceedings, the trial court orally ruled that there were grounds to support the termination of the parents' rights and that termination was in the children's best interests. The order terminating the parents' rights to the children was entered May 31, 2023. The trial court found that all of the grounds alleged in the petition had been established by clear and convincing evidence and that that termination of the parents' rights was in the children's best interests. This appeal followed.

## II. ISSUES PRESENTED

In this appeal, we resolve two questions: (1) whether the trial court erred in finding clear and convincing evidence of grounds for termination; and (2) whether the trial court erred in finding clear and convincing evidence to support the finding that termination is in the children's best interests. *See **In re Carrington H.**, 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these

---

[10] CM Burt testified that there were some reservations in continuing the contact or placing the children with the older brother, based on allegations of sexual abuse by the brother. But she stated that the brother simply stopped communicating with the children, and she did not attempt to contact him. There was also earlier DCS involvement with the parents' older children.

findings on appeal.").

### III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *Id.* at 521 (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual

- 8 -

finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002); ***In re Justice A.F.***, 2012 WL 4340709, at *7 (citing ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. ***In re Taylor B.W.***, 397 S.W.3d at 112; ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re Justice A.F.***, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See* ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009); *see also* ***In re Samaria S.***, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. ***In re Angela E.***, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Grounds for Termination

Although only one ground need be proven by clear and convincing evidence for a parent's rights to be subject to termination, "the Tennessee Supreme Court has instructed this Court to review each ground relied upon by the trial court to terminate parental rights in order to prevent 'unnecessary remands of cases.'" ***In re Bobby G.***, No. E2021-01381-COA-R3-PT, 2022 WL 2915535 (Tenn. Ct. App. July 25, 2022) (quoting ***In re Angela E.***, 303 S.W.3d at 251 n.14); *see also* ***In re Carrington H.***, 483 S.W.3d at 525–26. We therefore review each ground found by the trial court.

### 1. Abandonment by Failure to Visit and Support as to Mother

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment by a parent is a ground for the termination of parental rights and, in turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment." Under the version of that section that existed at the time the petition was filed, as relevant to this appeal, abandonment was defined as follows:

For a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent . . . of the child

- 9 -

who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either [has] failed to visit or [has] failed to support or [has] failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[11] The section further provides that a failure to visit consists of "the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). Similarly, a failure to support involves "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). When the provided support, "under the circumstances of the individual case, is insignificant given the parent's means[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(C). Here, the four-month period at issue spans from April 29, 2022 through August 28, 2022.[12]

CM Burt's uncontroverted testimony was that Mother provided no financial support for the children either during the relevant four months or the entirety of the custodial period, except for Easter baskets once after the termination petition was filed. CM Burt also testified that Mother did not visit with the children in person during this four-month period, or at any point after the children were removed from the parents' custody. Mother did have fairly regular phone calls with the children that potentially continued through April 2022. However, the facts of this case are clearly distinguishable from cases where we have accepted regular phone visitation in lieu of any physical visitation. *See, e.g.*, **In re Caira D.**, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *7 (Tenn. Ct. App. Nov. 25, 2014) (holding that the father's every-other-week phone calls where he spoke with the children "at length" was not token because the father lived seven hours away from the children, was of limited means, and did not have a driver's license). Here, there is no indication that the children were placed a significant distance from where the parents were living, and CM Burt testified that Mother was aware that DCS would provide transportation to facilitate visitation. Accordingly, to the extent that any of these calls occurred during the relevant period, Mother's phone contact with the children cannot be said to amount to more than token visitation. *See* **In re Candace J.**, No. M2015-01406-COA-R3-PT, 2016 WL 944268, at *7 (Tenn. Ct. App. Mar. 11, 2016) (finding that the mother's "phone

---

[11] Throughout this Opinion, we cite to the statutes that were in place at the time the termination petition was filed in August 2022.

[12] "The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." **In re Jacob C.H.**, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014).

conversations with [the child] were not a sufficient substitute for the in-person visitation that [the m]other could have exercised if she had appropriately prioritized the need to do so" where the only obstacle preventing in-person visitation was the passing of consecutive drug screens).

On appeal, Mother argues that this Court should reverse the trial court's findings because her failure to visit or support was not willful. But there is no indication that Mother raised a lack of willfulness as an affirmative defense. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("[I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful."). So this defense has been waived. *See* **Pratcher v. Methodist Healthcare Memphis Hosps.**, 407 S.W.3d 727, 735 (Tenn. 2013) (stating that "[a]s a general rule, a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading" (citing Tenn. R. Civ. P. 12.08)); **In re Imerald W.**, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at *4 n.5 (Tenn. Ct. App. Jan. 31, 2020) (stating that a parent waives a lack of willfulness as an affirmative defense when the parent fails to raise the defense at trial).

Moreover, a parent's failure to visit or support is willful only when it is "the product of free will, rather than coercion"; such failure "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." **In re Audrey S.**, 182 S.W.3d at 864 (first citing **In re Adoption of Lybrand**, 329 Ark. 163, 946 S.W.2d 946, 950 (1997); and then citing **In re Serre**, 77 Ohio Misc. 2d 29, 665 N.E.2d 1185, 1189 (1996); **Panter v. Ash**, 177 Or. App. 589, 33 P.3d 1028, 1031 (2001)). There is nothing in the record indicating that Mother was prevented in any way from obtaining income with which to support the children. And although visitation was suspended in February 2022, it is undisputed that the only requirement for visitation to be reinstated was a hair follicle drug screen, which CM Burt testified DCS would pay for and transport Mother to. Yet Mother did not complete this requirement until September 27, 2022, seven months after the order suspending visitation and several months after the filing of the termination petition. We cannot say that the single requirement to submit to and pass a drug screen "actually prevent[ed]" Mother from visiting the children. **In re Audrey S.**, 182 S.W.3d at 864; *see also* **In re Jaylah W.**, 486 S.W.3d 537, 551–52 (Tenn. Ct. App. 2015) ("It is well-settled that a trial court's order requiring that a parent complete some task or meet a condition before resuming visitation does not preclude a finding a willfulness."); **In re Romeo T.**, No. M2018-00269-COA-R3-PT, 2018 WL 4189575, at *5 (Tenn. Ct. App. Aug. 31, 2018) ("A parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child." (citation omitted)). The finding that Mother failed to visit or support the children is therefore affirmed.

**2. Abandonment by Failure to Visit and Support and Wanton Disregard as to Father**

Another definition of abandonment under section 36-1-102(1)(A) at the time the termination petition was filed applied, as relevant here, when:

> A parent . . . is incarcerated at the time of the filing of a . . . petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, or a parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:
>
> > (*a*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's . . . incarceration;
> > (*b*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of nonincarceration immediately preceding the filing of the action; or
> > (*c*) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This statutory language balances the idea that "incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" with the notion that "incarceration [alone] is not an infallible predictor of parental unfitness." ***In re Audrey S.***, 182 S.W.3d at 866. For this section, a period of incarceration that lasts less than seven consecutive days "must be counted as days of nonincarceration." Tenn. Code Ann. § 36-1-102(1)(J). Aggregation under subsection (b) "is accomplished by counting the days preceding, following, and in-between each period of incarceration of at least seven (7) consecutive days." Tenn. Code Ann. § 36-1-102(1)(K). Here, Father's incarceration from May 19 through June 9, 2022, both lasted more than seven consecutive days and fell within the four consecutive months immediately preceding the filing of the termination petition. So as an initial matter, Father is within "the class of people to whom the statute applies." ***In re Audrey S.***, 182 S.W.3d at 870.

There is no dispute that Father did not provide any support for the children at any point during the custodial period, either financially or in kind. Nor did Father visit with the children in person at any time after their removal. Like with Mother, we are unconvinced that Father's semi-regular phone calls with the children were an adequate substitute for physical visitation under the circumstances of this case. *See **In re Candace J.***, 2016 WL 944268, at *7. We are similarly not persuaded that the trial court's sole requirement that

Father submit to and pass a drug screen prior to reinstating visitation "amount[ed] to a significant restraint" on Father's ability to maintain a relationship with the children.[13] *In re Audrey S.*, 182 S.W.3d at 864; *see also **In re Romeo T.***, 2018 WL 4189575, at *5. Accordingly, there is clear and convincing support for these grounds, regardless of whether we rely on the period of four consecutive months prior to incarceration in subsection (a) or the aggregation of 120 days of nonincarceration in subsection (b).

Although section 36-1-102(1)(A)(iv)(c) does not specifically define "wanton disregard," "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Many cases have held that a "parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child." *In re Navada N.*, 498 S.W.3d 579, 602 (Tenn. Ct. App. 2016); *see also, e.g.*, *State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004). Furthermore, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" can constitute conduct demonstrating a wanton disregard for the child. *In re Audrey S.*, 182 S.W.3d at 867–68.

Here, there are four main areas of concern within Father's behavior: criminal activity, drug use, lack of financial support, and domestic violence against Mother. *See In re Johnathan M.*, 591 S.W.3d 546, 557 (Tenn. Ct. App. 2019) (noting that when we have found wanton disregard "where the parent's conduct was not particularly egregious and did not directly threaten the child's safety, more than one type of bad conduct has usually been present" (citation omitted)). Father pleaded guilty to a charge of possession of drug paraphernalia in January 2022. Father then pleaded guilty to two violations of his probation on the paraphernalia charge based on testing positive on two separate drug screens, which resulted in additional periods of incarceration. *See In re DNG*, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at *2 (Tenn. Ct. App. Oct. 13, 2004) ("Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child."). Moreover, Father's submission to and passing of a drug screen orchestrated by DCS was the only requirement for Father to restore his ability to visit with the children, and yet he did not submit to a screen until a full year after the order suspending visitation and well after the termination petition was filed. CM

---

[13] Moreover, Father did not raise the affirmative defense of a lack of willfulness at trial. *See* Tenn. Code Ann. § 36-1-102(1)(I); *In re Imerald W.*, 2020 WL 504991, at *4 n.5.

Burt testified that she believed Father was the sole financial provider for the family; Father's incarceration and correlating inability to earn income would therefore have an increased effect on the well-being of the children. And as previously discussed, Father did not provide any financial support after the children were removed. *See In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at \*18 (Tenn. Ct. App. Nov. 28, 2018) ("The failure to provide adequate financial support for a child is another type of conduct that can exhibit wanton disregard for the welfare of a child." (citing *In re Audrey S.*, 182 S.W.3d at 867–68)). The uncontroverted testimony also established that Father committed domestic violence against Mother and that the children witnessed the abuse. Indeed, at the time of removal, the family's landlord provided photographs of Mother's bruises and Gracie confirmed that the hole in the drywall was the result of Father pushing Mother into the wall.[14] *See In re Lilly C.*, No. E2015-01185-COA-R3-PT, 2016 WL 736386, at \*4 (Tenn. Ct. App. Feb. 25, 2016) ("Exposing a child to domestic violence is conduct exhibiting wanton disregard." (citation omitted)).

All of this conduct occurred despite Father's obvious knowledge that the children existed. The culmination of such behavior clearly and convincingly establishes a wanton disregard for the welfare of the children. *See In re K.F.R.T.*, 493 S.W.3d 55, 61 (Tenn. Ct. App. 2016) ("When viewed in their totality, these offenses clearly indicate that the 'parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders [Father] unfit or poses a risk of substantial harm to the welfare of the child[ren].'" (quoting *In re Audrey S.*, 182 S.W.3d at 866)). This ground is affirmed.

### 3. Abandonment by Failure to Establish a Suitable Home

The final allegation of abandonment relevant to this appeal was directed toward both of the parents and was defined as follows:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from

---

[14] Father emphasizes in his brief that "there were no allegations nor any evidence of domestic violence within [the family's] home for approximately ten months prior to the termination hearing." While this is certainly an improvement, it does not change the fact that the children were exposed to such violence by Father that CM Burt described Mother as "quite literally bruised from head to toe" in the photographs provided by the family's landlord.

being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

This ground "requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Homelessness does not lend itself to a "safe and stable environment for a child." *In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *11 (Tenn. Ct. App. Dec. 4, 2023) (citing *In re Jaxson F.*, No. E2023-00326-COA-R3-PT, 2023 WL 7179319, at *5–6 (Tenn. Ct. App. Nov. 1, 2023) (noting Mother's homelessness in upholding the trial court's determination as to the failure to provide a suitable home ground); *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) ("By the time of trial, Mother was no closer to providing a suitable home than when the children were removed from her custody. She was homeless.")). But "[a] suitable home is more than just an adequate physical space." *Id.* (citing *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *8 (Tenn. Ct. App. Apr. 27, 2015)). "A suitable home should be free from drugs and domestic violence." *In re Jaxson F.*, 2023 WL 7179319, at *4 (citing *Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). It also "requires the presence of a care giver who can supply the care and attention [a child] needs." *In re Malaki E.*, M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015) (quoting *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002)).

DCS is explicitly required by statute to expend "reasonable efforts" to assist a parent in establishing such a home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). This requires "more than simply providing a list of service providers"; DCS "should utilize its superior resources in assisting a parent to establish a suitable home[.]" *In re Masson S.*, No. E2021-01196-COA-R3-PT, 2022 WL 17104403, at *5 (Tenn. Ct. App. Nov. 22, 2022) (citations

- 15 -

omitted). However, DCS "does not bear the obligation to establish a suitable home alone, and parents must make their own efforts at reunification." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re C.L.M.*, M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005) (noting that "reunification is a 'two-way street'")). DCS's efforts may be deemed reasonable "if such efforts equal or exceed the efforts of the parent . . . toward the same goal[.]" Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *see also In re Aayden C.*, No. E2020-01221-COA-R3-PT, 2021 WL 2420154, at *8 (Tenn. Ct. App. June 14, 2021) (noting that "[DCS's] efforts need not be 'Herculean'" (citation omitted)). In this vein, a parent's cooperation with DCS and compliance with the various assessment and counseling requirements are "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009); *see also In re Shameel S.*, No. E2014-00294-COA-R3-PT, 2014 WL 4667571, at *5 (Tenn. Ct. App. Sept. 19, 2014) ("[P]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." (citation omitted)).

Here, the children were removed from the home and custody of the parents pursuant to the trial court's order in proceedings where DCS alleged that they were dependent and neglected children, and the children were placed in DCS custody. The trial court's order further found that DCS had made reasonable efforts to prevent removal. Thus, the only remaining questions involve (1) DCS's reasonable efforts over the course of a four-month period after removal to help the parents establish a suitable home; (2) the parents' reciprocal efforts; and (3) whether the parents are likely to establish a suitable home at an early date.

The trial court recounted the efforts made by DCS during the first four months after the children were removed, as testified to by CM Burt. The children were removed on October 8, 2021, so the period spans from October 9, 2021 through February 8, 2022. During this time, CM Burt attended four hearings and one child and family team meeting ("CFTM"), helped to develop a permanency plan that was sent to the parents, provided the parents a ride home after one court date, entered a purchase request for psychological assessments and hair follicle drug screens for the parents, reminded the parents of an upcoming court date, attempted to inform Mother of potential housing resources by phone four times, invited the parents to an educational meeting regarding Gracie, and offered to contact other potential placement options. CM Burt also contacted the parents twice regarding visitation, scheduled one visit that was subsequently rescheduled,[15] and

---

[15] The visit was scheduled after hours when CM Burt would be the only DCS employee present. She testified that she and her supervisor felt rescheduling was necessary based on Father's aggressive behavior over the phone. This behavior also influenced CM Burt to not personally offer transportation for

reminded the parents of the rescheduled visit. Two requests were made for Mother to submit to drug screens, and one made to Father.

As to the reciprocal efforts made by the parents in this time frame, CM Burt testified that the parents refused all drug screen requests, did not attend the rescheduled visit or provide notice that they would not be attending, and did not answer or return most of CM Burt's attempts at phone contact. Neither of the parents attended the CFTM or Gracie's educational meeting; Mother attended two hearings during this time, Father attended one and was incarcerated for another. At one point, Mother informed CM Burt by text that the parents were homeless and requested resources; CM Burt's phone call in response was not answered or returned. Another time, Mother informed CM Burt that Father was incarcerated and had abused her, but Mother did not accept CM Burt's offer to arrange for her to stay in a domestic violence shelter. CM Burt scheduled a phone call for the following day after Mother explained that she did not know her long-term living arrangements, but Mother did not answer. It is unclear where the parents were living at the end of this period, but they were admittedly homeless for at least part of this time. Under these circumstances, the evidence supports a finding that DCS's efforts equaled or exceeded those of the parents in establishing a suitable home during the first four months following removal.

On appeal, the parents both take issue with DCS's reliance on the efforts during this four-month period. Mother essentially argues, in our view, that using this timeframe is unfair, as the four months began before the hearing on the dependency and neglect petition and before the ratification of the first permanency plan. As such, Mother argues that she could not have known which steps she was required to take, including those aimed toward the provision of a suitable home. This argument is unavailing for multiple reasons. When the children were removed, the family's landlord informed CM Miller that she had begun the eviction process based on her concerns regarding drug use and domestic violence in the home. At the very least, the fact that they were being evicted provided notice to the parents that they needed to secure new housing. Records also indicated that DCS had been involved with the family prior to October 2021, based on concerns regarding educational neglect of the children, drug use, and homelessness. So again, the parents were aware of issues within the home that needed redressing prior to the development of the permanency plan. *See **In re Shameel S.**, 2014 WL 4667571, at *5. And these accounts were both included in the dependency and neglect petition, which was served upon both of the parents. Even without these external indicators, the uncontroverted testimony established the presence of significant domestic violence by Father during this period. Both CM Miller and CM Burt offered to assist Mother in relocating to a shelter and leaving this environment, which Mother refused. Clearly Mother was aware of issues within the home and her relationship that she could begin to rectify, even during this initial four-month period.

---

the parents.

- 17 -

For his part, Father argues that DCS's efforts during this period did not rise to the "reasonable" level. He asserts that there is no indication that CM Burt's purchase requests for drug screens and psychological assessments—which Father classifies as "basically the only instance of aid that DCS provided"—were ever approved or that CM Burt ever followed up to ensure that these services were utilized. Father cites to **In re Abraham S.**, where we determined that a DCS agent sending the parent a single housing application during the fourteen-month period between removal and the filing of the termination petition was not reasonable in comparison to the parent's own "meaningful effort to find housing[.]" No. M2022-00690-COA-R3-PT, 2023 WL 3494966, at *9 (Tenn. Ct. App. May 17, 2023). Respectfully, it is difficult to see that case's relation to the instant matter, as there is no indication here of any significant effort by the parents.[16] As discussed above, CM Burt noted multiple attempts to provide information regarding available resources that went unanswered by the parents. The parents also declined to attend Gracie's education meeting or submit to drug screens. Father also refused to refrain from criminal activity, drug use, and domestic violence. While DCS's efforts might not meet Father's lofty standards, DCS's efforts were hampered by the parent's lack of involvement and amounted to substantially more than nothing, which is the amount of effort Father expended. *Cf.* **In re Aayden C.**, 2021 WL 2420154, at *6 (agreeing with the trial court's assessment that "[i]t was not anyone else's responsibility but [the parents'] own to show that they could obtain stability and maintain that stability"). As such, CM Burt's efforts to assist the parents in establishing a suitable home during this period exceeded the efforts provided by the parents, and were thus "reasonable" under section 36-1-102(1)(A)(ii)(c).

Moreover, CM Burt provided testimony regarding her efforts and those of the parents for the entirety of the custodial period. *See* **In re Jakob O.**, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (noting that the ground "*does not* limit the court's inquiry to a period of four months *immediately* following the removal"). Between February and September 2022, CM Burt attempted to contact the parents and received no response at least seven times. CM Burt submitted two purchase requests for psychological assessments and two purchase requests for drug screens. One drug screen was scheduled and confirmed, only for neither of the parents to show; two additional requests for drug screens were refused.[17] Neither of the parents passed a drug screen or provided sufficient proof of prescriptions. The parents failed to attend three hearings despite reminders from CM Burt, and they could not be informed of a CFTM because CM Burt did not have their current contact information. Both parents did eventually complete psychological assessments, but neither of the parents completed domestic violence counseling. *See* **In re M.F.O.**, 2009 WL 1456319, at *5.

---

[16] And as both of the parents completed their psychological assessments, as discussed, *infra*, it does appear that CM Burt's purchase requests were approved.

[17] A third request was made at a permanency plan hearing when Father was incarcerated. Mother was willing to submit to the screen but her hair was dyed and her nails were too short for the screen to be completed.

Finally, even at the time of the termination hearing it was unclear that the parents had stable housing. In February 2022, the parents were living with a family friend but would not allow CM Burt into the home. In April 2022, CM Burt noted that the parents were living with Father's parents, and in July 2022, Mother informed her that the parents were attempting to fix up a trailer to live in. At some point, they moved into a house, providing CM Burt with the lease in February 2023. However, CM Burt was unable to conduct a home visit as Father would not let her into the house, citing issues with mold and broken windows. At trial, it was revealed that the parents were living with Father's father. Even though CM Burt testified that she was not aware of any issues with the physical home, she was not convinced of the longevity of the placement based on recurring conflicts between Father and his father. *See id.* ("A well-built, fully furnished home does not a 'suitable home' make; neither is a home which may lack some comforts or conveniences unsuitable for that reason alone."). Nor had CM Burt been able to conduct a home study, as she was not made aware of the change in housing prior to the termination hearing.

Accordingly, even if we look beyond the first four months after the children were removed, the evidence supports the finding that CM Burt's efforts exceeded those of the parents. We agree with the trial court's assessment that "[t]he parents' failure to make even minimal efforts to improve their home and personal condition demonstrates a lack of concern for the children to such a degree that it appears unlikely that they will be able to provide a suitable home for the children at an early date." Indeed, even at the termination hearing in April 2023, a year and a half after the children were removed from the parents' custody, there was no suitable home to which the children could return. This ground is therefore affirmed.

### 4. Substantial Noncompliance

Tennessee Code Annotated section 36-1-113(g) provides that parental rights may be terminated if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" Tenn. Code Ann. § 36-1-113(g)(2). According to the cited section, "[a] trial court must find that the requirements of a permanency plan are 'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)). The statute is clear that "noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial." *Id.* at 548. As such, "'[t]rival, minor, or technical' deviation from the permanency plan's requirements does not qualify as substantial noncompliance." *In re Yancy N.*, No. M2021-00574-COA-R3-PT, 2022 WL 17986782, at *6 (Tenn. Ct. App. Dec. 29, 2022) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). So to succeed in proving this ground, DCS must demonstrate both: (1) "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused

- 19 -

the child to be removed from the parent's custody in the first place" and (2) "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *7 (Tenn. Ct. App. Mar. 1, 2023) (quoting *In re M.J.B.*, 140 S.W.3d at 656–57).

Determining whether a parent has substantially complied with a permanency plan, therefore, "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (quoting *In re Valentine*, 79 S.W.3d at 547). Instead, the "real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. Similarly, the focus of our review is on "the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Yancy N.*, 2022 WL 17986782, at *6 (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)).

Here, DCS set out several responsibilities for the parents to complete in the initial permanency plan ratified in January 2022, that carried over to the subsequent plans ratified in May and November 2022. These requirements included (1) providing proof of three consecutive months of safe and stable housing, and allowing DCS to conduct home visits; (2) providing proof of a legal means of income; (3) resolving all pending criminal litigation and refraining from any future criminal activity; (4) submitting to a psychological assessment and successfully completing all recommendations; (5) submitting to an alcohol and drug assessment and successfully completing all recommendations; (6) successfully completing domestic violence counseling; (7) submitting to random drug screens, being able to test negative for any illicit or non-prescribed drugs, and providing proof of all prescriptions; and (8) visiting with the children no less than twice a month and keeping the children free from any form of domestic violence, drug exposure, or criminal activity. The trial court found that the requirements set out in the permanency plans were "reasonable and reasonably relate[d] to remedying" the conditions that led to the children's removal and placement into foster care, such that the parents' cooperation with the plans would have both addressed the reasons the children were in DCS custody and resolved the issues that kept the children from returning home. Neither of the parents argues that the requirements were not reasonable or related to the conditions that caused the removal of the children, so we will address each of the parents' efforts to comply with these requirements.

We begin with Mother. CM Burt testified that Mother did not (1) provide proof of stable housing; (2) provide proof of income; (3) submit to an alcohol and drug assessment; (4) complete domestic violence counseling; or, as discussed, *supra*, (5) visit with the children. Mother refused to submit to multiple drug screens, and then tested positive for buprenorphine on the one screen she completed in September 2022 without providing a

contemporaneous prescription. Mother did submit to a psychological assessment in July 2022 but did not successfully complete the sole recommendation of family counseling. In all, Mother only fully completed one permanency plan requirement: there were no reports of criminal activity by Mother at any point during the custodial period.

Mother argues that she took steps toward completing some of the plan's requirements and that others were not relevant to her. She asserts that she should not be penalized for her noncompliance with the plan's directive to successfully complete the recommendation of family counseling from her psychological assessment because visitation had been suspended. Indeed, visitation being suspended in February 2022 impacted Mother's ability to accomplish the July 2022 assessment's recommendation of family counseling. However, the trial court's only requirement for resuming visitation was a successful drug screen supported by proof of any prescriptions for which she tested positive. So the hurdle preventing completion of this requirement was solely within Mother's ability to remove. Mother should not be excused from an obligation that her own conduct rendered unachievable.

Mother also wants credit for the drug screen she completed in September 2022, because she provided "a current, valid prescription" at the time of trial. However, the pill bottle Mother produced at trial was dated April 7, 2023, which clearly cannot be used to explain the buprenorphine found in her system seven months earlier. The single drug screen Mother submitted to also does not negate the multiple other drug screens Mother refused.

As to not completing domestic violence counseling, Mother argues that domestic violence "was not an issue for her." However, the emphasis of this ground is the parent's effort in completing the plan's requirements, not on the achievement of the plan's goals. *In re Yancy N.*, 2022 WL 17986782, at *6. Here, Mother offers no explanation for her lack of effort to attend the required counseling and her failure to do so is not excused by the fact that she was the victim and not the perpetrator of the domestic violence within the family. Similarly, Mother emphasizes that the parents were living with Father's parents at the time of trial. This may indicate some progress toward the permanency plan's goal for the parents to have safe and stable housing. But this last-minute move to a home that CM Burt explained was not likely to be a long-term solution based on the volatile relationship between Father and his father does not indicate effort toward the stated requirement of the plan, which was to "obtain and maintain safe and stable housing with proof of rent and utilities paid for no less than 3 consecutive months." *See id.*

Finally, Mother argues that because she had not worked "in a very long time" and Father was believed by CM Burt to be the sole provider of the family, DCS did not expect Mother to financially provide for the children. Yet "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H). Moreover,

- 21 -

Mother's argument that she should not have been expected to obtain any form of income to help support the children perpetuates a self-defeating cycle. It appears that Mother was a stay-at-home mother prior to DCS's involvement, and that Mother anticipated returning to this role upon the children's return. But while the children were removed, there were no children for Mother to stay at home and mother, and a clear barrier to the parents regaining custody of the children was DCS's assessment that the parents could not support the children, as evidenced by the permanency plan requirement. Thus, by holding so tightly to her role within the family, Mother was in effect operating to prevent the reunification of the family and her resumption of that role. *Cf.* **In re V.L.J.**, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014) (noting that "the compliance required with a permanency plan is that which is necessary to overcome the reasons that children are removed from a parent and placed in foster care").

We turn now to Father. Father also did not (1) provide proof of stable housing; (2) provide proof of income; (3) submit to an alcohol and drug assessment; (4) complete domestic violence counseling; or, as discussed, *supra*, (5) visit with the children. Some attempt was made regarding the remaining requirements. Father was incarcerated in January 2022 regarding his drug paraphernalia charge, and then again in April and May 2022 for violating his probation by failing drug screens. There is no indication that Father was involved in any further criminal activity after being released from incarceration in June 2022. After refusing multiple earlier requests, Father submitted to a drug screen for DCS in February 2023 and tested positive for buprenorphine and oxycodone. Father provided a prescription for oxycodone in May 2022 and produced a pill bottle of buprenorphine prescribed in April 2023, at trial.

On appeal, Father admits that there are some permanency plan requirements that remain uncompleted and instead argues that the trial court did not consider the progress that was made.[18] Like Mother, Father completed a psychological assessment and the only

---

[18] Father raises two other arguments on appeal. He argues that the trial court did not make sufficient findings of fact and conclusions of law. While the trial court's findings and conclusions primarily relate to the requirements set out in the permanency plan, the trial court does outline those requirements the parents have met. No guesswork is therefore required to determine what the trial court found lacking in the parents' efforts. Thus, the trial court's explanation of its ultimate conclusion is such that the findings are sufficient for the purposes of this appeal. *See* **Hasley v. Lott**, No. M2022-01141-COA-R3-JV, 2023 WL 4633509, at *4 (Tenn. Ct. App. July 20, 2023) (concluding the trial court's findings were sufficient for appellate review where although the findings were "admittedly not exhaustive, they disclose[d] the steps by which the trial court reached its ultimate conclusion on each factual issue"); **Gooding v. Gooding**, 477 S.W.3d 774, 776 (Tenn. Ct. App. 2015) (holding that a trial court's finding are not sufficient when the court "is left to wonder on what basis the court reached its ultimate decision").

Father also argues that the trial court applied the wrong standard in the termination order by finding that Father had "not substantially complied" with the permanency plan. In some cases, we have held that doubt as to whether the trial court applied the correct standard required that we vacate this ground for termination. *See* **In re Jayden L.**, No. E2020-01668-COA-R3-PT, 2021 WL 2255496, at *3 (Tenn. Ct.

recommendation he received was to attend family counseling.[19] Compliance with this recommendation was hampered by the trial court's February 2022 order suspending visitation, but again, Father could have resumed visitation by producing a negative drug screen or providing contemporaneous proof of any prescriptions. Father did neither. So Father's failure to pass drug screens and provide timely proof of his prescription medications resulted in not completing four separate permanency plan requirements: avoiding further criminal activity, successful completion of the recommendation from the psychological assessment, testing negative for non-prescribed drugs, and visitation with the children.

Father also argues that the trial court erred in not considering the progress he made notwithstanding the failure to strictly comply with the permanency plan's requirements. First, Father emphasizes that there were no allegations of domestic violence during the ten months prior to the termination hearing. This is certainly an improvement on the prior state of the parents' relationship, and "[i]mprovement toward compliance should be considered in a parent's favor." *In re Valentine*, 79 S.W.3d 539, 549 (Tenn. 2002). However, it does not show any effort toward complying with the plan's requirement to "successfully complete domestic violence counseling & be able to verbalize and demonstrate what he has learned also geared toward the psychological affects and dangerousness that domestic violence has toward his children & their mother[.]" *Cf. id.* (comparing the parent's efforts to comply with visitation requirement prior to termination petition and prior to termination hearing); *see also In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *12 (Tenn. Ct. App. July 6, 2021) ("Mother had not completed any of the requirements prior to the termination petition being filed. Although Mother has recently begun to make progress on the requirements, Mother's efforts are 'too little, too late.'"). Moreover, even if we were to consider the lack of domestic violence reports as an improvement toward compliance, this progress does not negate the multitude of other tasks that Father did not complete.

---

App. June 3, 2021) ("Given the concern that arises from these written findings as to whether the trial court actually applied the proper standard in its ultimate disposition, we are compelled to vacate the trial court's order with respect to this ground."). That is not the case here. While the trial court did find that Father "has not substantially complied with the responsibilities and requirements set out for him," it also concluded that "DCS has proven by clear and convincing evidence, the ground of substantial noncompliance with the permanency plan[.]" *Cf. In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *7 (Tenn. Ct. App. Jan. 26, 2023) (affirming the trial court's finding as to this ground despite the reference to "substantial compliance" when it was "apparent from the court's analysis that it applied the appropriate standard"), *perm. appeal denied* (Tenn. Apr. 20, 2023). Moreover, we note that the phrase "did not substantially comply" has recently been used by the Tennessee Supreme Court in this context *See, e.g.*, *In re Markus E.*, 671 S.W.3d at 474 (considering "the question of whether Mother did not substantially comply" with the requirement to obtain a mental health requirement). Thus, we conclude that the trial court's use of imprecise language is not a basis to vacate this ground.

[19] From the record, it appears that Father's assessment occurred at some point between July and October 2022.

Father also asserts that his failure to provide proof of income is inconsequential because CM Burt was aware that he had employment. Indeed, CM Burt admitted that Father reported working on-and-off for his father. But as she did not believe that Father would receive pay stubs from this employment, or that he would appreciate her speaking with his father without his permission, CM Burt testified that she asked Father for even a handwritten note verifying his employment. Father did not provide any such verification. Clearly, given the parents' lack of housing and Mother's refusal to work outside the home, DCS was rightly concerned about the parents' ability to financially provide for their children. It was therefore not unreasonable for DCS to ask for proof of Father's income even knowing that he was sporadically employed by a family member. He flatly refused to comply with this reasonable request. This does not evince an effort to comply with the spirit of the plan's requirement, let alone its letter.

Based on the evidence provided, although some minimal progress was made by the parents in effecting the goals of the permanency plan developed by DCS, it is clear that the parents did not put any significant effort into complying with the requirements set out therein. In our view, the most important of these requirements—relating to passing drug screens, obtaining and proving income sufficient to support the children, completing domestic violence counseling, and maintaining safe and stable housing—received the least effort from the parents. The parents generally failed to "complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term[.]" *In re V.L.J.*, 2014 WL 7418250, at *8. We affirm the finding that the parents were in substantial noncompliance with the permanency plan.

### 5. Persistence of Conditions

The trial court also terminated the parents' parental rights on the ground commonly known as "persistence of conditions." This ground applies when:

The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian

- 24 -

in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). A parent's "failure to remedy the conditions which led to the removal need not be willful" in order to prevent the safe return of the child to the parent's care. *In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000); *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). The six-month removal period "must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B). Here, the children were removed from the home and custody of the parents by a juvenile court order pursuant to DCS's petition alleging that the children were dependent and neglected. The children's removal in October 2021 occurred more than six months before the April 2023 termination hearing. So as an initial matter, this ground may apply to the parents.

There can be no dispute that the children were placed in DCS custody based on allegations of drug exposure, domestic violence, and educational neglect. As discussed, *supra*, the parents have not effectively remedied the drug exposure and domestic violence concerns. The record reflects that these conditions, as well as the additional concern of housing insecurity, still exist, and in all reasonable probability will cause the children further abuse or neglect. Considering the length of time that the children have been in DCS custody and the lack of significant improvement in the parents' circumstances, there is little likelihood that these conditions will be remedied at an early date to allow for the safe return of the children to the parents' custody. *See Dep't of Children's Servs. v. B.B.M.*, No. E2006-01677-COA-R3-PT, 2007 WL 431251, at *9 (Tenn. Ct. App. Feb. 9, 2007) ("Given that [m]other has been unable to remedy these problems for many years, it is unlikely that these conditions would be remedied at any time in the near future.").

Finally, the children are in a foster home that may become pre-adoptive and their educational needs are being met. The children enjoy the stability of the foster home and are open to being adopted; maintaining the children's relationship with the parents greatly diminishes their chances of integration into a safe, stable, and permanent home. Thus, we affirm the trial court's decision finding clear and convincing evidence to support the ground of a persistence of conditions.

### 6. Failure to Manifest an Ability and Willingness

The trial court also determined that the parents failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee

Code Annotated section 36-1-113(g)(14). Parental rights may be terminated where:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parents have failed to evince either an ability or a willingness to assume custody of the children. *In re Brylan S.*, No. W2021-01446-COA-R3-PT, 2022 WL 16646596, at *8 (Tenn. Ct. App. Nov. 3, 2022) (citing *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020)). The second requires proof that placing the children in the parents' custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). The termination statute explicitly requires courts terminating parental rights to "enter an order that makes specific *findings of fact* and conclusions of law[.]" Tenn. Code Ann. § 36-1-113(k) (emphasis added); *see also* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.").

> The following is the entirety of the trial court's findings as to this ground:
>
> 61. The [parents] have failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the children.
> 62. Placing the children in the [parents'] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.
> 63. DCS has proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1-113(g)(14) against [the parents].

Respectfully, although the trial court's order specifically addresses each element of the ground, it does so in a purely conclusory manner, without any specific findings of fact.

Making appropriate findings of fact and conclusions of law "facilitate[s] appellate review and promote[s] just and speedy resolution of appeals." *In re Audrey S.*, 182 S.W.3d at 861. In termination cases, a trial court's failure to comply with section 36-1-113(k) and provide proper findings and conclusions not only affects the standard of review, "[i]t affects the viability of the appeal." *In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *13 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re Zoey L.*, No. E2019-01702-COA-R3-PT, 2020 WL 2950549, at *2 (Tenn. Ct. App. June 3, 2020)). Indeed,

appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." ***In re Charles B.***, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at \*9 (Tenn. Ct. App. Nov. 15, 2021) (quoting ***In re Carrington H.***, 483 S.W.3d at 523). As such, we vacate the trial court's order in relation to the ground of failure to manifest an ability and willingness to assume custody of the child. *See **In re Haley S.***, No. M2017-00214-COA-R3-PT, 2018 WL 1560078 (Tenn. Ct. App. Mar. 29, 2018) (vacating the trial court's determinations regarding grounds where it failed to make sufficient findings of fact and conclusions of law).

Generally, when a trial court fails to make appropriate findings and conclusions as directed by statute, the remedy is for this Court to remand the matter for the filing of a more detailed final order. ***Id.*** (remanding the matter with instruction that the trial court make appropriate findings and conclusions). As we have determined that there were other grounds for termination proven by clear and convincing evidence, however, we do not remand this matter to the trial court for additional findings and conclusions regarding this ground. ***In re Ralph M.***, No. E2021-01460-COA-R3-PT, 2022 WL 3971633, at \*16–17 (Tenn. Ct. App. Sept. 1, 2022) (vacating one ground due to insufficient findings of fact but declining to remand for additional findings because "other grounds exist[ed]").

## B. Best Interests

Because we have determined that a statutory ground for terminating the parents' parental rights has been proven, we must now decide if DCS has proven, by clear and convincing evidence, that termination of the parents' rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of children include, but are not limited to, the following:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;

- 27 -

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and

effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1); *see also* **In re Jackson R.**, No. M2021-01545-COA-R3-PT, 2023 WL 353420, at \*9 n.8 (Tenn. Ct. App. Jan. 23, 2023) (noting that "the amended statute applies only to petitions for termination filed on or after April 22, 2021").

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." **In re M.A.R.**, 183 S.W.3d at 667 (citations omitted). Similarly, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. **In re Audrey S.**, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." **Id.** (citing **White**, 171 S.W.3d at 194). After considering the statutory factors and the ultimate effect termination would have on the children's lives, the trial court found that there were no factors that weighed against termination.

We agree with the trial court's assessment that termination of the parents' rights will serve the children's best interests. Although a year and a half had passed between the children's removal and the termination hearing, the parents had made very little progress toward a change in circumstances. *See* Tenn. Code Ann. § 36-1-113(i)(J) (involving the parent's lasting adjustment of circumstances), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs). And as previously discussed, there is no indication that the parents have remedied the issues that necessitated DCS's involvement: drug exposure, domestic violence, educational neglect, and homelessness.

The parents are correct in their arguments that there was no proof specifically regarding the children's fear of the parents' home or whether the children have trauma related to the parent's home. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home). But this is more reflective of the fact that the parents remained housing insecure at the time of the termination hearing than any indication of the quality of the parents' home. Indeed, it was revealed at the termination hearing that the parents were living with Father's father, but concerns regarding the stability of that housing remained, based on the unpredictable nature of that relationship. CM Burt also explained that she did not know whether that home was suitable for the children because she had not been able to conduct a home visit.[20] Nor had the parents provided a negative drug screen

---

[20] Earlier in the custodial period, the parents had refused to allow home visits and admitted that

or adequate proof of any prescriptions. *See* Tenn. Code Ann. § 36-1-113(i)(Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home).

The parents again argue that DCS did not make reasonable efforts to help them make a lasting adjustment of circumstances. *See* Tenn. Code Ann. § 36-1-113(i) (L) (involving DCS's reasonable efforts to assist the parent). Based on the affidavit of reasonable efforts provided by CM Burt and her testimony regarding the reciprocal efforts made by the parents, it is clear that in this case DCS put forth at least as much effort toward assisting the parents as the parents did themselves. *See* Tenn. Code Ann. § 36-1-113(i)(K) (involving the parent's use of available resources). The parents' refusal to complete domestic violence counseling in particular weighs in favor of termination as they have yet to address the emotional toll on the children of seeing such violence.[21] *See* Tenn. Code Ann. § 36-1-113(i)(N) (involving any abuse or neglect present in the parent's home by the parent or others residing there), (T) (involving the effect of the parent's mental and emotional fitness on the child).

That a change in caretakers would negatively affect the children is additionally clear in relation to the concerns of educational neglect prior to DCS involvement. *See* Tenn. Code Ann. § 36-1-113(i) (B) (involving the effect of a change in caretakers on the child's well-being), (C) (involving the parent's continuity in meeting the child's needs). At the time of removal, the parents stated that the children were being homeschooled, but they could provide no evidence of the curriculum, nor is there anything in the record to explain why the children were removed from the schools they were previously attending. In contrast, the children are currently in appropriate schools and doing well.

The children were placed in a new foster home shortly before the termination hearing and it was uncertain whether the home was pre-adoptive. The parents point out that the children would need to be in the foster home at least six months prior to the possibility of adoption. However, CM Burt testified that the children had already formed bonds with the foster family and she was optimistic about the longevity of the placement. *See* Tenn. Code Ann. § 36-1-113(i)(H) (involving the child's attachment to another parent-figure), (I) (involving the child's other interpersonal attachments).[22] CM Burt also explained that the

---

there were environmental concerns in one of their many prior residences.

[21] Mother argues that she had previously taken "exceptional care" of the children and understood their basic needs. *See* Tenn. Code Ann. § 36-1-113(i) (O) (involving the parent's prior provision of safe and stable care to any child). Yet Mother has been resistant to taking steps to ensure the safety and security of the children's home. On more than one occasion, Mother has been offered assistance in escaping Father's domestic violence in order to restore her relationship with the children. Mother has categorically chosen Father throughout the duration of this case.

[22] Though the children had some connection with their older brother, that relationship is unlikely to be affected by termination of the parents' rights as he stopped contacting the children while they were in

children were enjoying the stability of foster custody compared to that provided by the parents.[23] *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability). And the proof shows that it is unlikely that the parents could remedy the conditions that necessitate foster care in the same time period that the children could become available for adoption.

Finally, as discussed, *supra*, the parents have not provided any financial support for the children since their removal in October 2021. *See* Tenn. Code Ann. § 36-1-113(i)(S)(involving the provision of financial support). Nor have the parents visited with the children once during the custodial period. *See* Tenn. Code Ann. § 36-1-113(i)(E) (involving visitation). Although CM Burt stated that the children love the parents and were initially upset about being removed from the parents' custody, she explained that the security of the relationship has deteriorated because the children are aware that the parents are not fulfilling their obligations to regain custody. *See* Tenn. Code Ann. § 36-1-113(i)(D) (involving the security of the parent-child attachment); *cf.* **In re Addalyne S.**, 556 S.W.3d at 795–96 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]")

From all of the above, we find clear and convincing evidence that termination of the parents' parental rights is in the best interests of the children. The trial court's ultimate decision to terminate the parents' rights is affirmed.

## V. CONCLUSION

The judgment of the Smith County Juvenile Court is therefore vacated in part and affirmed in part, and this matter is remanded to the trial court for further proceedings as necessary and consistent with this Opinion. Costs of this appeal are taxed one-half to Respondent/Appellant Sheila K. and one-half to Respondent/Appellant Ernest K., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

DCS custody.

[23] Specifically, CM Burt testified that "both children have acknowledged that stability is something that has been good for them and that they have enjoyed . . . living independently, . . .learning chores, having a safe home to go home to every night, knowing where they're going to sleep at night."